UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

ALFRED LAFORD,

                    Plaintiff,                              Case No. 2:22-cv-193

v.                                                          Honorable Paul L. Maloney

HEIDI WASHINGTON et al.,

                    Defendants.

_____/

## **OPINION**

This is a civil rights action brought by a prisoner under 42 U.S.C. § 1983. Plaintiff paid the full filing fee in this action. Further, Plaintiff has filed a motion to amend (ECF No. 4), a motion for the appointment of counsel (ECF No. 7), a motion requesting service by the U.S. Marshals (ECF No. 9), and a motion to hold in abeyance the request for the appointment of counsel and the request for service by the U.S. Marshals ("motion to hold in abeyance") (ECF No. 8).

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these

standards, the Court will dismiss Plaintiff's amended complaint[1] for failure to state a claim against Defendants Washington, Huss, James, Unknown Central Facility Administrator, Unknown Transfer Coordinator, Unknown Assistant Deputy Warden of Housing, Unknown Assistant Deputy Warden of Custody, and Unknown Resident Unit Manager. Plaintiff's Eighth Amendment claims against Defendants Leach, Morgan, Saatio, Unknown Registered Nurse, Negrinelli, McGrath, and Wright will remain in the case. Further, the Court will grant Plaintiff's motion to amend, and will deny Plaintiff's motion to hold in abeyance, motion for the appointment of counsel, and motion requesting service by U.S. Marshals.

## Discussion

### I.   Plaintiff's Pending Motions

#### A.   Motion to Amend

Plaintiff has filed a motion to amend (ECF No. 4), and he attached a proposed amended complaint (ECF No. 4-1) to his motion. A party may amend once as a matter of course before a responsive pleading is served. *See* Fed. R. Civ. P. 15(a). Plaintiff has not previously amended his complaint and no responsive pleadings have been filed in this action. Accordingly, Plaintiff's motion to amend (ECF No. 4) will be granted, and his attached proposed amended complaint (ECF No. 4-1) will be docketed as his amended complaint.

#### B.   Motion to Hold in Abeyance

Plaintiff has filed a motion requesting that the Court hold his motion for the appointment of counsel and his motion requesting service by the U.S. Marshals in abeyance "until the conclusion of th[e] Court's initial review and any early arbitration that is ordered." (ECF No. 8,

---

[1] As set forth in this opinion, the Court will grant Plaintiff's motion to amend and will order that Plaintiff's proposed amended complaint (ECF No. 4-1) be filed as Plaintiff's amended complaint. As such, the amended complaint is the operative complaint in this matter.

PageID.89.) The Court notes that Plaintiff chose to file these motions, and besides Plaintiff's apparent preference to now have the motions ruled on at a later date, he has provided no reason to warrant holding the motions in abeyance. Therefore, Plaintiff's motion to hold in abeyance will be denied. If Plaintiff does not wish the Court to rule on motions until a certain time, he should refrain from filing motions until that time.

### C.    Motion for the Appointment of Counsel

Plaintiff has filed a motion requesting the appointment of counsel. (ECF No. 7.) Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court has carefully considered these factors and has determined that, at this time, the assistance of counsel is not necessary to the proper presentation of Plaintiff's position. Plaintiff's motion for the appointment of counsel (ECF No. 7) therefore will be denied.

### D.    Motion Requesting Service by the U.S. Marshals

Plaintiff has filed a motion requesting that service of his complaint be effected by the U.S. Marshals. (ECF No. 9.) Plaintiff's request to serve the complaint is premature. Prior to service of the complaint, this action will be referred to the Court's *Pro Se* Prisoner Mediation Program.

3

Furthermore, Plaintiff paid the full filing fee in this action, and he is not proceeding *in forma pauperis*. As such, Plaintiff will be responsible for service of the summons and complaint upon each Defendant. *See* Fed. R. Civ. P. 4. Accordingly, Plaintiff's motion requesting service by the U.S. Marshals (ECF No. 9) will be denied at this time.

## II.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues MDOC Director Heidi Washington and Unknown Central Facility Administrator, as well as the following MBP officials and medical personnel: Warden Erica Huss; Unknown Transfer Coordinator; Captain Unknown Leach; Unknown Assistant Deputy Warden of Housing; Unknown Assistant Deputy Warden of Custody; Unknown Resident Unit Manager; Registered Nurses Unknown Party, Christy Negrinelli,[2] and Jessica Wright[3]; Corrections Officers Unknown Morgan, Unknown Saatio, and Unknown McGrath; and Health Care Unit Manager Brenda James. (Am. Compl., ECF No. 4-1, PageID.56–59.)

Plaintiff's action presents claims regarding COVID-19-related events that occurred at MBP in 2020. Plaintiff states that in spring of 2020, Defendant Washington issued orders to the MDOC's prisons to comply with the governor's orders and directives regarding the COVID-19 pandemic. (*Id.*, PageID.59–60.) One of Defendant Washington's orders "limited prisoner transfers" and required "Defendant Unknown Central Administrator's approval before they were carried out."

---

[2] In Plaintiff's original complaint, he identified this Defendant as "Nurse Ms. Christy." (Compl., ECF No. 1, PageID.1–2.)

[3] In Plaintiff's original complaint, he identified this Defendant as "Nurse Ms. Jessica." (*Id.*)

(*Id.*, PageID.60.) In September of 2020, Plaintiff alleges Defendants Unknown Central Facility Administrator, Huss, and Unknown Transfer Coordinator "made the decision to transfer infected prisoners to MBP." (*Id.*, PageID.61.) Plaintiff states that "these [D]efendants took no action to train their employees concerning COVID protocols and took no action to protect medically fragile prisoners at MBP." (*Id.*)

Additionally, Plaintiff states that Defendants Leach, Unknown Assistant Deputy Warden of Housing, and Unknown Assistant Deputy Warden of Custody "were responsible for staff training in [the] proper use [of] [personal protective equipment (PPE)], and assigning staff to work in particular housing units." (*Id.*) Plaintiff claims that these Defendants "failed to train but also knowingly allowed custody staff at MBP to let their belief in conspiracy theories dictate imprope[r] use of PPE and sterilization techniques." (*Id.*) Plaintiff states that the COVID-19-positive prisoners "were housed in C Unit in open cells with barred fronts." (*Id.*, PageID.61–62.) Plaintiff claims that Defendants Huss, Unknown Assistant Deputy Warden of Housing, Unknown Assistant Deputy Warden of Custody, and Unknown Resident Unit Manager "made the housing decisions in concert." (*Id.*, PageID.62.)

At that time, Plaintiff "locked in B Unit[] and worked in the prison's law library." (*Id.*) Plaintiff states that Defendants Leach, Unknown Assistant Deputy Warden of Housing, and Unknown Assistant Deputy Warden of Custody "routinely scheduled" Defendants Saatio, Morgan, and McGrath to "work back to back shifts alternating between B and C Units." (*Id.*) Plaintiff claims that Defendants Saatio, McGrath, and Morgan "were deliberately indifferent when they maliciously ignored COVID protocols," explaining that they "often went back and forth between B and C Units without appropriate PPE." (*Id.*) Plaintiff also claims that Defendants Huss, Leach, Unknown Assistant Deputy Warden of Housing, and Unknown Assistant Deputy Warden of

Custody "allowed prisoners to move in mass to the prison yard with other prisoners." (*Id.*, PageID.62–63.)

Plaintiff made Defendants Morgan, Saatio, and McGrath "aware of his asthma." (*Id.*, PageID.63.) "Aware of this condition, they made disparaging remarks, one of which was the statement, 'I don't care if prisoners die of COVID.'" (*Id.*) Plaintiff claims that these Defendants "deliberately with malicious intent refused to allow prisoners to sanitize common surfaces," such as the JPay kiosk. (*Id.*)

On October 2, 2022, Plaintiff first began "experiencing symptoms of COVID." (*Id.*) Plaintiff "reported the symptoms to [Defendant] Saatio who refused to call medical." (*Id.*) Defendant Saatio told Plaintiff that "since he didn't have a temperature, he would have to go to work in the law library." (*Id.*) Plaintiff alleges that "[t]he actions of the above Defendants led directly to [him] catching COVID." (*Id.*)

Plaintiff states that mass testing began in late September or early October of 2020, and MBP "went on COVID lockdown status" on October 3, 2020. (*Id.*, PageID.63–64.) The "lockdown stopped prisoners from going to a common yard and laid in prisoners who worked in non-essential jobs such as the law library." (*Id.*, PageID.64.) "Plaintiff was confined to his cell in B-Block." (*Id.*) Subsequently, on October 7, 2020, Plaintiff "began experiencing sever[e] COVID symptoms," including "extreme shortness of breath, coughing spasms which led to vomiting, dizziness, and a racing heart." (*Id.*) That same day, Defendant Unknown Registered Nurse conducted rounds in B Unit, and Plaintiff reported his symptoms to Defendant Unknown Registered Nurse. (*Id.*) Plaintiff claims that she refused to provide treatment, and she did "not even checking vital signs before she moved on." (*Id.*) Plaintiff was tested for COVID-19 on October 8, 2020, and the following day,

Plaintiff was identified as "likely COVID positive, but he was not provided any medical care at that time." (*Id.*, PageID.64–65.)

On October 10, 2020, Defendant Morgan "came to Plaintiff's cell front and told him he had to work as a unit porter." (*Id.*, PageID.65.) Plaintiff told Defendant Morgan that he "wasn't even classified as a porter, and that he wasn't physically able to work as he couldn't catch his breath even when sitting down" and "needed to be close to his breathing machine." (*Id.*) Defendant Morgan responded that "he did not care how sick Plaintiff was, [and that] he could either work as a porter or go to administrative segregation." (*Id.*) Plaintiff then "consented to work." (*Id.*)

"Over the next few days, Defendant Morgan forced Plaintiff to climb hundreds of flights of stairs [while working as a unit porter] in spite of [Defendant Morgan] seeing Plaintiff cough until he threw up." (*Id.*, PageID.66.) Plaintiff claims that Defendant Morgan "refused Plaintiff access to his breathing machine," and Defendant Saatio "forced [Plaintiff] to labor until he was close to death." (*Id.*)

Subsequently, "[o]n October 14, 2020, Plaintiff's October 8, 2020, lab test came back positive." (*Id.*) Plaintiff was seen by nurse practitioner Derek Falk (not a party), and "[i]t was determined that Plaintiff needed immediate hospitalization." (*Id.*) At the hospital, "it was determined that [Plaintiff] was suffering acute respiratory failure," and a chest x-ray "showed lung volume with likely viral pneumonia." (*Id.*, PageID.66–67.)

Plaintiff returned to MBP on October 19, 2020, and Plaintiff's discharge report from the hospital "stated that he should remain in isolation resting until his symptoms subsided." (*Id.*, PageID.67.) Upon Plaintiff's return to MBP, he wrote to Defendant James "informing her of staff['s] disregard of Covid protocols and requesting PPE, so that Plaintiff could avoid further infection." (*Id.*)

7

On October 27, 2020, Defendants Saatio and McGrath told Plaintiff "work on D block or in segregation you shall dwell." (*Id.*) "Plaintiff explained to them that he needed ready access to his breath machine, and that he was so short of breath that work would be nearly impossible." (*Id.*) Plaintiff was "again[] forced . . . to climb hundreds of flights of stairs even when [he] told them '[his] heart was racing' and that [he] believed [his] pneumonia had returned." (*Id.*, PageID.68.) "At about th[e] same time [that] Plaintiff attempted to refuse work[,] Defendant Captain Leach came to talk to Plaintiff." (*Id.*) Defendant Leach "told Plaintiff that he did not care how sick Plaintiff was[;] it was either work or segregation." (*Id.*) Plaintiff claims that "[a]gain [his oxygen] saturation rate was so low that he was disorientated, but he did report his symptoms," which included tachycardia and shortness of breath, to Defendants Negrinelli and Wright. (*Id.*) Plaintiff further claims that "[n]either of these Defendants took action," and Defendant Negrenelli stated, "if I treat you[,] we'll have to take everybody to the hospital." (*Id.*)

At some point that same day, October 27, 2020, nurse practitioner Jo Ann Samuelson (not a party) "saw Plaintiff being forced to work and took his vitals." (*Id.*) Plaintiff "was immediately given medication" and taken to the hospital. (*Id.*, PageID.69.) Plaintiff alleges that "[f]rom that point forward, [he] has had persistent chronic tackycardia [sic] that requires medication," which Plaintiff believes "resulted from [him] being forced to work while his body could not get enough [oxygen]." (*Id.*) Plaintiff claims that "[a]s a direct result of the actions of these defendants, Plaintiff has received a permanent life altering ailment that not only reduces Plaintiff's ability to earn wages but also requires him to spend money monthly going forward." (*Id.*)

Based the foregoing allegations, Plaintiff alleges that Defendants violated his rights under the Eighth Amendment. (*Id.*, PageID.70.) As relief, Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief. (*Id.*, PageID.70–71.)

### III.     Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271

(1994). In this action, Plaintiff alleges that all Defendants violated his right to be free from cruel and unusual punishment under the Eighth Amendment. (Am. Compl., ECF No. 4-1, PageID.70.)

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Eighth Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, the prisoner must show that he faced a sufficiently serious risk to his health or safety and that Defendants acted with "'deliberate indifference' to inmate health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S.

at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

A.      **Objective Prong**

In this action, Plaintiff contends that he was incarcerated under conditions that put him at risk of contracting COVID-19. (*See generally* Am. Compl., ECF No. 4-1.)

In a 2020 case brought by federal prisoners under 28 U.S.C. § 2241, the United States Court of Appeals for the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death.  The BOP acknowledges that "[t]he health risks posed by COVID-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

Under that precedent, a medically vulnerable plaintiff may satisfy the objective prong by alleging conditions that could facilitate COVID-19 transmission within a prison and the health risks posed by the virus. Plaintiff alleges conditions that could have facilitated COVID-19 transmission within his prison, and Plaintiff states that he suffers from at least one condition that

might make him medically vulnerable: asthma. (*See* Am. Compl., ECF No. 4-1, PageID.63.) Therefore, at this early stage of the proceedings, the Court concludes that Plaintiff has alleged facts sufficient to satisfy the objective prong of the deliberate indifference test.

### B.    Subjective Prong

In *Wilson*, the Sixth Circuit also addressed the subjective prong of an Eighth Amendment COVID-19-related claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.
>
> The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include
>
>> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.
>
> *Id.* at 42–43.
>
> The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.

> Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court granted the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Wilson*, 961 F.3d at 840–41.

In its decision in *Wilson*, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as quarantining infected inmates and distributing information about a disease in an effort to prevent spread to be reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective

13

equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.

Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Id.* at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions, not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19

at the jail. The district court initially granted a preliminary injunction requiring the defendants to

"(1) provide all [j]ail inmates with access to certain protective measures and medical care intended

to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and

Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.*

at 394. However, following the decision in *Wilson*, the Court granted the defendants' renewed

emergency motion to stay the preliminary injunction, finding that the preventative measures taken

by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable

response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an

unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v.*

*Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

More recently, the Sixth Circuit affirmed this Court's dismissal of a claim similar to

Plaintiff's:

> Dykes-Bey alleges that the defendants were deliberately indifferent to the serious
> risk of harm posed by COVID-19. A deliberate-indifference claim under the Eighth
> Amendment includes both an objective and a subjective prong: (1) the inmate "is
> incarcerated under conditions posing a substantial risk of serious harm," and
> (2) "the official knows of and disregards an excessive risk to inmate health or
> safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).
>
> As we recognized in *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020), "the
> objective prong is easily satisfied" in this context. "The COVID-19 virus creates a
> substantial risk of serious harm leading to pneumonia, respiratory failure, or death."
> *Id*. "The transmissibility of the COVID-19 virus in conjunction with [a prison's]
> dormitory-style housing—which places inmates within feet of each other—and [an
> inmate's] health risks, presents a substantial risk that [an inmate] will be infected
> with COVID-19 and have serious health effects as a result, including, and up to,
> death." *Id*. The objective prong is met here.
>
> The subjective prong, on the other hand, generally requires alleging at least that the
> defendant "acted or failed to act despite his knowledge of a substantial risk of
> serious harm." *Id*. (quoting *Farmer*, 511 U.S. at 842). "The official must have a
> subjective 'state of mind more blameworthy than negligence,' akin to criminal
> recklessness." *Cameron v. Bouchard*, 815 F. App'x 978, 984 (6th Cir. 2020)
> (quoting *Farmer*, 511 U.S. at 835). As relevant here, "[t]he key inquiry is whether
> the [defendants] 'responded reasonably to the risk' . . . posed by COVID-19."

*Wilson*, 961 F.3d at 840–41 (quoting *Farmer*, 511 U.S. at 844) (alterations added and omitted). And a response may be reasonable even if "the harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted.'" *Id*. at 841 (quoting *Farmer*, 511 U.S. at 844).

Dykes-Bey fails to satisfy the subjective prong. He alleges that the defendants, knowing of the harm posed by COVID-19, acted with deliberate indifference by not providing KCF's inmates with the necessary means to practice social distancing. But Dykes-Bey's complaint does not allege any facts indicating that the defendants were deliberately indifferent to him or any other plaintiff. The complaint does not allege, for example, that KCF had enough physical space to implement social distancing, and that the defendants deliberately chose not to use that space. *Cf. Cameron*, 815 F. App'x at 986 (concluding that the plaintiffs failed to produce evidence showing that the defendants let empty prison cells go unused). Nor does it allege that the defendants knowingly housed COVID-19-positive inmates alongside any plaintiff, or even that a COVID-19 outbreak occurred in KCF. Dykes-Bey's allegations about the lack of social distancing, therefore, do not establish deliberate indifference.

Moreover, Dykes-Bey's focus on social distancing ignores the "key inquiry" in these cases—whether the defendants "'responded reasonably to the risk' . . . posed by COVID-19." *Wilson*, 961 F.3d at 840–41 (citation omitted). To that end, Dykes-Bey's own allegations establish that the defendants acted reasonably. The complaint recognizes, for example, that the defendants screened employees daily for COVID-19 symptoms, provided masks to inmates, required correctional officers to wear masks (although some unnamed officers allegedly did not wear them properly), and provided bleach-based disinfectant in every communal bathroom. In other words, Dykes-Bey's complaint acknowledges that the defendants took affirmative steps to mitigate COVID-19's risks. Although he argues that those steps would ultimately be insufficient to stop an outbreak, whether these steps were sufficient matters less than what they say about the defendants' states of mind. *Id*. at 841 (noting that defendants may have responded reasonably even if the "harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted'" (quoting *Farmer,* 551 U.S. at 844)). That is, what matters is whether the precautionary steps taken show that the defendants responded reasonably to the risks of COVID-19. Here, as in *Wilson*, they do. *See, e.g.*, *id.* at 840–41 (finding that similar measures amounted to a reasonable response). In short, these allegations defeat the subjective prong and thus his deliberate indifference claim.

The district court concluded that the defendants were not deliberately indifferent, but it relied on materials outside the record—official sanitation and hygiene policies adopted by the MDOC, reports of confirmed COVID-19 cases at KCF, and an MDOC press release—to reach this conclusion. *See* R. 36, Page ID# 281. Even if its consideration of those materials was improper, we may affirm on any basis supported by the record. *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002). As stated, Dykes-Bey's own allegations suffice to show that the defendants did not

disregard the risks of COVID-19. Therefore, we affirm the district court's judgment on those grounds.

*Dykes-Bey v. Washington*, No. 21-1260, 2021 WL 7540173, at *2–3 (6th Cir. Oct. 14, 2021) (footnote omitted).

> **1.    Defendants Washington, Huss, James, Unknown Central Facility Administrator, Unknown Transfer Coordinator, Unknown Assistant Deputy Warden of Housing, Unknown Assistant Deputy Warden of Custody & Unknown Resident Unit Manager**

With respect to Plaintiff's claims against the above-listed Defendants, as an initial matter, Plaintiff's own allegations describe steps that Defendants took in response to the COVID-19 pandemic and the outbreak at MBP. For example, Plaintiff states that Defendant Washington issued orders to comply with the governor's orders and directives regarding the COVID-19 pandemic (Am. Compl., ECF No. 4-1, PageID.59–60), and that there was "mass testing" for COVID-19 at MBP in late September and early October of 2020. (*Id.*, PageID.63–64.) Further, Plaintiff contends that COVID-19-positive prisoners, who had been transferred to MBP, were housed in a separate unit—Unit C. Although Plaintiff states that the unit with the COVID-19-positive prisoners had open-bar cells, Plaintiff does not allege that he was housed with, or was in close proximity to, the COVID-19-positive prisoners in these cells. (*See id.*, PageID.61–62.)

As to Plaintiff's allegation that Defendants Unknown Assistant Deputy Warden of Housing and Unknown Assistant Deputy Warden of Custody "routinely scheduled" Defendants Saatio, Morgan, and McGrath to "work back to back shifts alternating between B and C Units" and that Defendants Saatio, Morgan, and McGrath "ignored COVID protocols" and "went back and forth between B and C Units without appropriate PPE," Plaintiff fails to allege any facts suggesting that Defendants Unknown Assistant Deputy Warden of Housing and Unknown Assistant Deputy Warden of Custody knew that Defendants Saatio, Morgan, and McGrath were not following

"COVID protocols." (*Id.*, PageID.62.) Instead, Plaintiff's allegations show that "COVID protocols" were in place for officers working at MBP even if individual officers did not follow the protocols. Further, although Plaintiff alleges in a conclusory manner that Defendants Unknown Assistant Deputy Warden of Housing and Unknown Assistant Deputy Warden of Custody "knowingly allowed" unidentified "custody staff" at MBP "to let their belief in conspiracy theories dictate imprope[r] use of PPE and sterilization techniques," Plaintiff fails to provide any further explanation or facts to support this assertion. (*Id.*, PageID.61.) Such a conclusory allegation without specific supporting factual allegations fails to state a claim. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.

Moreover, to the extent that Plaintiff seeks to hold Defendants Washington, Huss, James, Unknown Central Facility Administrator, Unknown Transfer Coordinator, Unknown Assistant Deputy Warden of Housing, Unknown Assistant Deputy Warden of Custody, and Unknown Resident Unit Manager liable for the actions of their subordinates, government officials, such as these Defendants, may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead

that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Sixth Circuit repeatedly has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee*, 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993).

Here, Plaintiff fails to allege any *facts* showing that Defendants Washington, Huss, James, Unknown Central Facility Administrator, Unknown Transfer Coordinator, Unknown Assistant Deputy Warden of Housing, Unknown Assistant Deputy Warden of Custody, and Unknown Resident Unit Manager encouraged or condoned the conduct of their subordinates, or authorized, approved, or knowingly acquiesced in the conduct. Plaintiff's conclusory allegation of supervisory responsibility is insufficient to demonstrate that these Defendants were personally involved in the alleged violations of Plaintiff's constitutional rights. Because Plaintiff has failed to allege that Defendants Washington, Huss, James, Unknown Central Facility Administrator, Unknown Transfer Coordinator, Unknown Assistant Deputy Warden of Housing, Unknown Assistant Deputy Warden of Custody, and Unknown Resident Unit Manager engaged in any active unconstitutional behavior, Plaintiff fails to state a claim against these Defendants.

      **2.**     **Defendants Leach, Morgan, Saatio, Unknown Registered Nurse, Negrinelli, McGrath & Wright**

Plaintiff alleges that he personally interacted with Defendants Leach, Morgan, Saatio, Unknown Registered Nurse, Negrinelli, McGrath, and Wright, and that these Defendants were deliberately indifferent to his risk of serious harm as related to the COVID-19 pandemic and Plaintiff's COVID-19-positive diagnosis. At this stage of the proceedings, taking Plaintiff's allegations as true and in the light most favorable to him, the Court may not dismiss Plaintiff's Eighth Amendment claims against Defendants Leach, Morgan, Saatio, Unknown Registered Nurse, Negrinelli, McGrath, and Wright on initial review.

<u>Conclusion</u>

Plaintiff's motion to amend (ECF No. 4) will be granted. The Court will direct the Clerk to file Plaintiff's proposed amended complaint (ECF No. 4-1) as his amended complaint on the docket for this matter. Plaintiff's motion to hold in abeyance (ECF No. 8), motion for the appointment of counsel (ECF No. 7), and motion requesting service by U.S. Marshals (ECF No. 9) will be denied.

Further, having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Washington, Huss, James, Unknown Central Facility Administrator, Unknown Transfer Coordinator, Unknown Assistant Deputy Warden of Housing, Unknown Assistant Deputy Warden of Custody, and Unknown Resident Unit Manager will be dismissed for failure to state a claim under 28 U.S.C. § 1915A(b), and 42 U.S.C. § 1997e(c).

Plaintiff's Eighth Amendment claims against Defendants Leach, Morgan, Saatio, Unknown Registered Nurse, Negrinelli, McGrath, and Wright remain in the case.

An order consistent with this opinion will be entered.


Dated:   January 20, 2023                          /s/ Paul L. Maloney
                                                   Paul L. Maloney
                                                   United States District Judge